# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| BRIAN GELFER, individually and derivatively on behalf of Lead Infusion LLC, a Delaware Limited Liability Company, | |
| *Plaintiff,* | |
| v. | Civil Action No: |
| JOHN CALLADINE, | Demand for Jury Trial |
| *Defendant,* | |
| and | |
| LEAD INFUSION LLC, a Delaware Limited Liability Company, | |
| *Nominal Defendant.* | |

## VERIFIED COMPLAINT

Plaintiff BRIAN GELFER ("Plaintiff" or "Gelfer"), by and through his undersigned counsel, for his complaint and jury demand against the defendant, JOHN CALLADINE ("Defendant" or "Calladine") and nominal defendant LEAD INFUSION LLC ("Lead Infusion" or the "Company"), alleges as follows:

## STATEMENT OF CASE

1.      Plaintiff, a member of Lead Infusion LLC, a Delaware limited liability company, brings this derivative action against defendant Calladine, the other member of Lead Infusion LLC, for cybersquatting in violation of Section 43(d) of the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1125(d); use of false designations of origin, false descriptions and false representations, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement, in violation of the common law of

Delaware; conversion, in violation of the common law of Delaware; removal of Calladine as a member based on the Operating Agreement; breach of the duty of loyalty for seizure of corporate sales opportunities; breach of the duty of loyalty for removal of the Company's website and email; all arising out of Calladine's unlawful inclusion and use of Lead Infusion's service mark LEAD INFUSION (the "LEAD INFUSION Mark") in numerous domain names on the Internet.  Plaintiff also asserts claims for breach of duty of loyalty on behalf of Lead Infusion, LLC and himself as a member of same.  Plaintiff seeks injunctive relief, damages, statutory damages, punitive damages and recovery of its costs and reasonable attorneys' fees.

## PARTIES

2.      Plaintiff Brian Gelfer is an individual residing in California.

3.      Defendant Calladine is an individual residing in Toronto, Ontario, Canada.

4.      Nominal Defendant Lead Infusion is a Delaware limited liability company which filed a Certificate of Formation with the Delaware Secretary of State on January 15, 2013 with Delaware identification number 5274915.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1337, 1338(a), and the Lanham Act, 15 U.S.C. § 1051 *et seq.*

6.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over nominal defendant Lead Infusion because it is registered as a limited liability company in the State of Delaware.

8.      This Court has personal jurisdiction over defendant Calladine by virtue of his prior conduct as a member-manager of Lead Infusion, out of which this action arises, and pursuant to 6 Del. C. §18-109, 10 Del. C. § 3104 and the Due Process Clause of the United States Constitution.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because defendant Calladine is subject to personal jurisdiction in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

10.     Lead Infusion is a marketing and website development company specializing in online marketing, designing and maintaining custom websites for real estate agents. The Company has developed a strong presence as a go-to resource for online marketing programs, consulting, content, information systems and specialty, lead management websites, for a variety of clients in the national real estate market.

11.     The impetus for starting Lead Infusion, the business name and the trademark, were Plaintiff Brian Gelfer's creation.

12.     On or around January 10, 2013, Plaintiff asked defendant John Calladine to register the domain name <leadinfusion.com> (the "Lead Infusion Domain Name") for exclusive use by Lead Infusion LLC, in preparation for formally establishing the Company. Plaintiff engaged defendant Calladine to register the Lead Infusion Domain Name, and at Plaintiff's direction, Defendant registered the domain name <leadinfusion.com> with registrar Moniker Online Services LLC.

13.     On or around January 15, 2013, Plaintiff formed the Delaware limited liability company Lead Infusion LLC (the nominal defendant herein), which would own, operate, and maintain all the assets, rights and title to the Lead Infusion business as previously described.  Plaintiff and defendant Calladine became the sole members of the company.

14.     Also on or around January 10, 2013, Mr. Calladine, at Plaintiff's direction, registered the domain name <leadinfusion.com> with the domain name registrar Moniker Online Services LLC.

15.     On or around February 8, 2013, Plaintiff instructed defendant Calladine to register other domain names on behalf of the Company, to wit: <leadinfusion.org>, <leadinfusion.net>, <leadinfusion.biz>, <leadinfusion.co.uk>.

16.     Upon information and belief, defendant Calladine did not register the requested domain names at that time.

17.     From all times relevant herein, Calladine remained an employee of Lead Infusion until his resignation from Lead Infusion in December of 2013. At the same time, Calladine began conversations with competitors of Lead Infusion. Lead Infusion interfaced with its customers at the domain name address located at <leadinfusion.com>, in addition to offering information regarding the Company and its services at that address.

18.     All employees of Lead Infusion, including Plaintiff, defendant Calladine, and other staff employees of the Company, had email addresses that incorporated the second level domain of "leadinfusion.com," for example, brian@leadinfusion.com.

19.     Upon the formation of the Company, defendant Calladine transferred to the Company any and all rights he had to intellectual property and domain names associated with the LEAD INFUSION Mark.

## LEAD INFUSION'S SERVICE MARK

20.     At all times relevant herein, Lead Infusion consistently and extensively used the phrase LEAD INFUSION in commerce as a designator of origin for its high quality services (the "LEAD INFUSION Mark").

21.     Lead Infusion has continuously from its inception used the LEAD INFUSION Mark in United States interstate commerce as a designator of origin for its high quality online marketing, consulting, information systems and website development services.

22.     Lead Infusion has not licensed defendant Calladine to use the LEAD INFUSION Mark.

23.     The LEAD INFUSION Mark is nationally recognized and well regarded in connection with the Company's offering of online marketing and related services.

24.     Lead Infusion, and by extension Plaintiff, owns significant and protectable common law rights to the LEAD INFUSION Mark and name acquired through continuous, exclusive, and extensive use of the Lead Infusion Domain Name for over a year, and the LEAD INFUSION Mark for at least that much time.

25.     As a result of Lead Infusion's continuous and exclusive use of the LEAD INFUSION Mark, and substantial transactions and presences within the real estate marketing and website development community, the LEAD INFUSION Mark has become widely and favorably known as identifying Lead Infusion's services and has acquired goodwill and positive reputation throughout the United States.

26.     Since 2012, Lead Infusion, through Plaintiff, has advertised its services using the Lead Infusion Domain Name, and has used the LEAD INFUSION Mark to advertise its services through its website to over 30 active clients and customers and hundreds of prospective clients throughout the nation.

27.     The Lead Infusion Domain Name was vital to customer retention and acquisition.

28.      Furthermore, client referrals, business networking and word-of-mouth testimonials have also generated considerable interest in Lead Infusion and the Lead Infusion website.

29.     All of Lead Infusion's advertising prominently displays the LEAD INFUSION Mark.

30.     As a result of the Company's continuous and substantial use, advertising, and promotion, the LEAD INFUSION Mark has become recognizable.  The goodwill and reputation of the LEAD INFUSION Mark are strong and extremely valuable to Lead Infusion.

31.     Revenues for services offered in connection with the LEAD INFUSION Mark were over $225,000 in fiscal year 2013, on an accrued basis.

32.     The LEAD INFUSION Mark represents the services offered by Lead Infusion to the consuming public.

33.     The LEAD INFUSION Mark has generated so much goodwill and acquired such tremendous secondary meaning, that any good, service, domain name, advertisement, or business bearing such marks, in whole or in part, is immediately associated by customers and the public as being a product or service affiliated with Lead Infusion.

34.     Due to the extensive use and advertising of the LEAD INFUSION Mark, the mark is distinctive under the laws of the United States.

**DEFENDANT'S UNLAWFUL ACTIONS**

35.     Despite Plaintiff's direction to defendant Calladine to register the domain name <leadinfusion.com> (the "Lead Infusion Domain") on behalf of the Company, Calladine is currently listed as the sole registrant of the Lead Infusion Domain Name.

36.     On or around December 16, 2013, defendant Calladine resigned from Plaintiff and relinquished his right and title as a member in the Company.

37.     Prior to and following defendant Calladine's resignation from the Company, Plaintiff demanded that Calladine properly transfer the Lead Infusion Domain Name to the Company as the registrant.

38.     Calladine refused to transfer the Lead Infusion Domain on each occasion.

39.     On or around early December 2013, defendant Calladine caused the Lead Infusion Domain to stop pointing to Lead Infusion's website, causing tremendous damage and disruption to the Company's business.

40.     From around December 16, 2013 to the present, defendant Calladine has removed the Company's content from the domain and listed it for sale, with the following text: "This domain name www.leadinfusion.com is for sale. Please contact john at

leadinfusion.com if you are interetsed [*sic*]." Defendant Calladine inserted the name and logo of "Real Web Names" <www.realwebnames.com> onto the domain of <www.leadinfusion.com>. Real Web Names is a website owned and operated by defendant Calladine offering for sale domain names to the public.

41.    Then, defendant Calladine caused the Lead Infusion Domain to stop pointing to Lead Infusion's email client, causing all email to stop working, and causing tremendous damage and disruption to the Company's business.

42.    Between December 16, 2013 and December 25, 2013, defendant Calladine registered, in his own name, the following domain names that incorporate the LEAD INFUSION Mark (collectively with the Lead Infusion Domain Name, the "Accused Domain Names"):

      a.    <leadinfusion.net> - registered on 12/16/13

      b.    <leadinfusion.org> - registered on 12/18/13

      c.    <leadinfusion.co.uk> - registered on 12/25/13

      d.    <leadinfusion.biz> - registered on 12/25/13

      e.    <leadinfusion.info> - registered on 12/25/13

      f.    <leadinfusion.mobi> - registered on 12/25/13

      g.    <leadinfusion.us> - registered on 12/25/13

43.    As a result of defendant Calladine's unlawful conduct, Lead Infusion's clients, vendors and contacts were no longer able to reach Plaintiff or the Company by email or at the website previously located at the Lead Infusion Domain Name.

44.    Upon information and belief, defendant Calladine has caused the other Accused Domain Names to point to generic web "parking" pages containing links advertising various products and services. Upon information and belief, a number of the links re-directed users to websites operated by direct competitors of Lead Infusion and/or by Calladine himself.

45.     Sometime after Plaintiff contacted defendant Calladine to direct him to transfer the Accused Domain Names to Plaintiff, defendant removed the parked web pages.  On information and belief, defendant Calladine did so in an attempt to hide from this Court the fact that for weeks the parked web page at one or more of the Accused Domain Names hosted links to websites operated by competitors of Lead Infusion and/or by defendant Calladine himself.

46.     As of the date of this Complaint, defendant Calladine has removed the "for sale" sign from the website.  Plaintiff believes this was done in an attempt to conceal defendant Calladine's bad-faith tactics from the Court, and is still offering the Lead Infusion Domain Name for sale.

47.     During defendant Calladine's work and employment with Lead Infusion, he had access to confidential information and trade secrets belonging to Lead Infusion, namely, its client list, prospective client list, client contact information, accounting, marketing and sales information, past history and proprietary materials used by the Company in connection with its marketing services to the national real estate market.

48.     Upon information and belief, immediately preceding and following defendant Calladine's resignation from Lead Infusion, Calladine began active discussions with competitors, such as the company called Quantum Leads, with the intention of taking prospective clients that had been Lead Infusion's prospective clients, to competitors and to Plaintiff's existing vendor.  Defendant Calladine also engaged an active campaign to court Plaintiff's existing and prospective clients with the intent to solicit business.

49.     Upon information and belief, defendant Calladine was aware of the existence of contractual relationships these clients had with Lead Infusion.

50.     As a result of defendant Calladine's actions, certain clients ceased to work with Lead Infusion.

### DERIVATIVE ACTION ALLEGATIONS

51.     Plaintiff brings this action derivatively as a member of nominal defendant Lead Infusion.  At all times relevant herein, Plaintiff has been a member of Lead Infusion.

52.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

53.     Plaintiff has not made a demand upon the remaining member of the Company to bring this suit because such a demand would be futile.  It is futile to expect that defendant Calladine would bring an action on behalf of Lead Infusion against himself for cybersquatting, trademark infringement, conversion, breach of duty of loyalty, and tortious interference against Lead Infusion.  Defendant Calladine has a direct personal interest in this matter that is in direct conflict with Lead Infusion's interests because he is directly benefiting from his violation of Lead Infusion's rights.

## OPERATING AGREEMENT OF LEAD INFUSION

54.     Plaintiff and defendant Calladine discussed and agreed upon an unexecuted governing document for Lead Infusion captioned "Our Operating Agreement" (the "Operating Agreement").

55.     The Operating Agreement at the outset split equity between Plaintiff and defendant Calladine in a manner that was "50/50 from the get go".

56.     The Operating Agreement required a review of the equity split after twelve (12) months and provided a list of objective considerations that would adjust the equity split between Plaintiff and defendant Calladine based on a list of objective criteria, including: Relative Commitment, Effort and Time by both Calladine and Gelfer; and whether Calladine met or exceeded sales targets.

57.     Calladine professed to have experience in sales and in real estate and promised to generate the needed clients for Lead Infusion based on his experience.

58.     Calladine originally forecasted 118 clients in 2013.

59.     On or around June or July 2013, Calladine revised the sales targets to 147 clients in 2013.

60.     On or around September or October 2013, Calladine confirmed again sales target of 147 clients for 2013.

61.     There were approximately thirty-three (33) actual clients of Lead Infusion at the end of 2013.

62.     Upon information or belief, Calladine confessed to working 6 hours per day, 5 days per week with 3 vacations of about 6 weeks of vacation total.

63.     Gelfer was working frequently and regularly working every day of the week, approximately 17 hours per day or more with no vacations or days off.

64.     Upon information and belief, Calladine managed a sales team.

65.     Upon information and belief, Calladine over the past few months before his resignation, directed the sales team not to bring new leads to Lead Infusion.

66.     Upon information and belief, on or about December 15, 2014, Calladine informed Gelfer that Calladine was speaking with a Competitor named "Quantum Leaps" and other competitors about assisting them with sales leads.

67.     Calladine failed to produce any new sales leads in December 2013.

68.     Upon information and belief, Calladine was planning to and did take new sales leads to a competitor.

69.     By withdrawing from his role as leader of sales, Calladine has shifted the entire burden for new sales to Gelfer.

70.     Calladine complained about not making enough compensation from Lead Infusion and stated he could make more elsewhere.

71.     Calladine requested for Gelfer to explain to Calladine why Calladine should continue to work for Lead Infusion.

72.     Calladine knowingly and/or recklessly overpromised services to potential clients of Lead Infusion, including showing potential clients sample websites that far exceeded the scope of website that Lead Infusion was designing for clients.

73.     Calladine knowingly and/or recklessly informed potential clients that services were included which were not included.

74.     Calladine voluntarily withdrew from Lead Infusion in December 2013.

## FIRST CLAIM FOR RELIEF

### CYBERSQUATTING
### UNDER 15 U.S.C. § 1125(d)

75.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 74, with the same force and effect as if set forth in detail herein again.

76.     By using the LEAD INFUSION Mark as a domain in the Accused Domain Names, defendant Calladine has registered, trafficked in or used a domain name that is confusingly similar to the LEAD INFUSION Mark and, upon information and belief, defendant Calladine has done so with the bad faith intent to profit unlawfully from the LEAD INFUSION Mark.

77.     The aforesaid actions constitute cybersquatting, in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

78.     The unauthorized use of the LEAD INFUSION Mark as a domain in the Accused Domain Names has caused, and unless and until enjoined will continue to cause, irreparable injury to Lead Infusion and the goodwill associated with its LEAD INFUSION Mark.  An award of monetary damages alone cannot fully compensate Lead Infusion for its injuries and therefore Lead Infusion lacks an adequate remedy at law.

79.     By reason of defendant Calladine's acts alleged herein, Plaintiff is entitled to recover Calladine's profits, actual damages, and the cost of the action, or statutory damages under 15 U.S.C. § 1117, on election by Plaintiff, in the amount of One Hundred Thousand Dollars ($100,000.00) per cyber-squatted domain name.

80.     The foregoing acts have been, and continue to be, deliberate, willful and wanton, making this an "exceptional" case within the meaning of 15 U.S.C. § 1117.

81.     Plaintiff has incurred costs, including without limitation, attorney's fees and court costs, in seeking to prevent the transfer of the Domain Name.

## SECOND CLAIM FOR RELIEF

### USE OF FALSE DESIGNATIONS OF ORIGIN, FALSE DESCRIPTIONS AND FALSE REPRESENTATIONS UNDER 15 U.S.C. § 1125(a)

82.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 81, with the same force and effect as if set forth in detail herein again.

83.     The LEAD INFUSION Mark serves to identify the services offered by Lead Infusion.  Accordingly, services offered in connection with the LEAD INFUSION Mark are regarded by the public as being sponsored by, approved by, authorized by, associated with and/or affiliated with Lead Infusion.

84.     Defendant Calladine's wrongful conversion of the LEAD INFUSION Mark as domain names has caused confusion or mistake among the public as to the true origin, source, sponsorship, approval, authorization, association or affiliation of defendant Calladine's services, all to defendant Calladine's profit and Lead Infusion's damage.

85.     Defendant Calladine's aforesaid use of the LEAD INFUSION Mark as domain names constitutes use of false designations of origin, false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act, 15

U.S.C. § 1125(a), as a result of which Lead Infusion will continue to be irreparably injured unless and until Calladine's conduct is enjoined by this Court.

86.     The foregoing acts of trademark infringement have been, and continue to be, deliberate, willful and wanton, making this an "exceptional" case within the meaning of 15 U.S.C. § 1117.

## THIRD CLAIM FOR RELIEF

## COMMON LAW TRADEMARK INFRINGEMENT

87.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 86, with the same force and effect as if set forth in detail herein again.

88.     Lead Infusion, by virtue of its prior adoption and use in interstate commerce of the LEAD INFUSION Mark, in this judicial district and elsewhere, has acquired, established and owns valuable common law rights in the LEAD INFUSION Mark.

89.     Defendant Calladine's use of the LEAD INFUSION Mark as a domain in the Accused Domain Names constitutes copying and imitation by defendant Calladine of the LEAD INFUSION Mark, falsely designates the origin of defendant Calladine's services, is likely to cause confusion, mistake or deception and therefore, infringes Lead Infusion's common law rights in the LEAD INFUSION Mark, in violation of the common law of Delaware.

90.     Defendant Calladine's wrongful actions were willful and intentional.

91.     Defendant Calladine's actions complained of herein, unless enjoined by this Court, will (1) result in the likelihood of confusion, mistake and deception by the public concerning the source or origin of services offered by defendant Calladine, and (2) produce attendant irreparable injury and damage to Lead Infusion and its business reputation.

## FOURTH CLAIM FOR RELIEF

### COMMON LAW UNFAIR COMPETITION

92.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 91, with the same force and effect as if set forth in detail herein again.

93.     By virtue of Lead Infusion's prior use of the distinctive LEAD INFUSION Mark in interstate commerce throughout the country, LEAD INFUSION has come to be associated exclusively with Lead Infusion and its distinctive LEAD INFUSION Mark.

94.     Defendant Calladine's wrongful conversion and unauthorized use in interstate commerce of the LEAD INFUSION Mark as domain names directly competes with Lead Infusion's services, especially given that the LEAD INFUSION Mark continues to appear in the domain name portion of a user's address bar regardless of what links a user selects, is likely to cause consumer confusion as to the source or sponsorship of defendant Calladine's services.

95.     Upon information and belief, defendant Calladine has used the LEAD INFUSION Mark in the manner identified herein with the intent of trading unlawfully upon Lead Infusion's established goodwill in that mark.  Defendant Calladine's actions, therefore, constituted unfair competition with Lead Infusion, in violation of the common law of Delaware, and his actions have irreparably injured and will continue to irreparably injure Lead Infusion unless and until such conduct is enjoined temporarily, preliminarily and thereafter permanently by this Court.

## FIFTH CLAIM FOR RELIEF

### CONVERSION

96.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

97.     Defendant Calladine has committed the act of wrongful dominion over and wrongful control and retention of company assets belonging to Lead Infusion and to the detriment of Lead Infusion.  Defendant Calladine possesses no right, title, or interest in the company assets, including Plaintiff's domain name <leadinfusion.com>. At all times relevant hereto nominal defendant held a property interest in and had a right to possess the Company's assets, including but not limited to, <leadinfusion.com>.

98.     As a result of defendant Calladine's willful and wrongful acts set forth above, plaintiff has been damaged.

## SIXTH CLAIM FOR RELIEF

## BREACH OF DUTY OF LOYALTY AND CARE

99.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 98, with the same force and effect as if set forth in detail herein again.

100.    At all times while employed by the Company, defendant Calladine owed the duty of loyalty and care to the Company and to Mr. Gelfer, as a member of the Company.

101.    Defendant Calladine breached his duty of loyalty and care to the Company and to Mr. Gelfer, as a member of the Company, when defendant Calladine committed one or more of the following:

    a.  The act of wrongful dominion over and wrongful control and retention of company assets belonging to Lead Infusion;

    b.  Intentionally and without justification interfered with the Company's contractual relations.

    c.  Took Company interests elsewhere, including instructing the sales team to stop selling and taking potential client leads and entering into direct dialog with a competitor.

    d.  Placed a principal asset of the Company, the Lead Infusion Domain Name <leadinfusion.com>, for sale on the Company's website, intentionally creating confusion as to the ongoing existence of the company and any resulting sale of the domain name could result in the destruction of the business.

102.    As a result of defendant Calladine's breach of his duty of loyalty and care to Plaintiff Brian Gelfer and the Company, Plaintiff has suffered damages.

## SEVENTH CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

103.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 102, with the same force and effect as if set forth in detail herein again.

104.    Lead Infusion had existing contractual relationships with customers and vendors.

105.    Defendant Calladine had knowledge of Lead Infusion's existing contractual relationships.

106.    Defendant Calladine's actions intentionally and without justification interfered and continue to interfere with Lead Infusion's contractual relationships.

107.    As a result of defendant Calladine's tortious interference with Lead Infusion's contractual relations, Plaintiff has suffered damages.

## EIGHTH CLAIM FOR RELIEF

## PUNITIVE DAMAGES

108.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 107, with the same force and effect as if set forth in detail herein again.

109.    With full and actual knowledge of the wrongfulness of the conduct and high probability that injury or damage to the claimant would result, defendant Calladine has adopted the LEAD INFUSION Mark as domain names for the sole purpose of benefiting from consumer traffic intended for Lead Infusion's website, <leadinfusion.com>, and has engaged in website and/or server manipulation techniques in order to enhance the likelihood of consumer confusion with the LEAD INFUSION Mark.

110.    Despite this knowledge, defendant Calladine intentionally pursued the foregoing course of conduct in wanton disregard of Lead Infusion's resultant injury.

111.    As a result of defendant Calladine's intentional and unlawful activities as set forth above, Lead Infusion is entitled to an award of punitive damages for its common law claims for trademark infringement and unfair competition.

## NINTH CLAIM FOR RELIEF

## RECALCULATION OF MEMBERSHIP INTEREST BASED ON CONTRACT

112.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 111, with the same force and effect as if set forth in detail herein again.

113.    Under the "Equity" section of the Operating Agreement, Calladine and Gelfer agreed to alter their equity split agreement after 12 months according to objective benchmarks.

114.    Calladine's performance according to the objective benchmarks was a dereliction of his promises.

115.    Calladine's actions, under the section of the Operating Agreement titled "Equity", failed to meet his own benchmarks.

116. Calladine's efforts, under the section of the Operating Agreement titled "Equity", were a small fraction of Gelfer's efforts.

117. Calladine's actions were of such a inadequate nature, that he is not entitled to an equal share of Lead Infusion.

118. Gelfer therefore should be declared the *de facto* majority member in interest of Lead Infusion.

119. Calladine's actions, after he realized he was not adequately performing, were to move against Lead Infusion and were so destructive, that under the Operating Agreement benchmarks, Calladine should not be entitled to any membership interest in Lead Infusion.

120. Having either a lesser equity interest or zero equity interest, Calladine should not be able to deadlock any decisions of Lead Infusion.


## TENTH CLAIM FOR RELIEF

### BREACH OF THE DUTY OF LOYALTY – <u>SEIZURE OF CORPORATE OPPORTUNITIES</u>

121. Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 120, with the same force and effect as if set forth in detail herein again.

122. Lead Infusion, prior to Calladine's resignation, had a reasonable expectation in obtaining potential clients from Calladine and the sales team.

123. Upon information and belief, prior to his resignation, Calladine misappropriated potential clients and redirected them to other competitors.

124. Upon information and belief, Calladine profited from leads that were directed to competitors instead of Lead Infusion prior to his resignation.

125.    Calladine's actions were directly adverse and antagonistic to the best interest of Lead Infusion and amounted to self-dealing by Calladine.

126.    Calladine's violation of his fiduciary duties for refusing to perform his duties of sales and acting adversely to Lead Infusion's interest by misappropriating opportunities resulted in damages to Lead Infusion in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF

## BREACH OF THE DUTY OF LOYALTY – REMOVAL OF WEBSITE AND EMAIL

127.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 126, with the same force and effect as if set forth in detail herein again.

128.    Calladine breached his fiduciary duty by taking down Lead Infusion website and email systems.

129.    Calladine's actions in removing the website and email for Lead Infusion was destructive to the credibility and reputation of Lead Infusion with its clients and potential clients.

130.    Calladine's actions in removing the website and the email for lead Infusion interfered with communications to and from Lead Infusion.

131.    Communications by email and a consistent website are essential to modern business operations.

132.    Removing the ability to locate Lead Infusion on the web and by email resulted in consumer confusion and loss of confidence in clients and potential clients.

133.    Removing the ability to locate Lead infusion on the web and by email caused Lead Infusion to create an alternate website and email without business continuity and a loss of the search engine rankings already obtained for the company's initial website causing damages in amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.  Enter judgment that the LEAD INFUSION Mark is valid and enforceable; and
    that defendant Calladine, as a result of his use of the LEAD INFUSION Mark as a
    domain in the Accused Domain Names, has engaged in acts of cyberpiracy in
    violation of 15 U.S.C. § 1125(a), has used false designations of origin, false
    descriptions and false representations in violation of 15 U.S.C. § 1125(a), has
    infringed Lead Infusion's rights in the LEAD INFUSION Mark in violation of the
    common law of Delaware, has engaged in unfair competition with Lead Infusion,
    in violation of the common law of Delaware, and has otherwise injured Lead
    Infusion by using the LEAD INFUSION Mark in the manner complained of
    herein.;

2.  The Court issue an injunction enjoining defendant Calladine and each of his
    related companies, agents, employees, attorneys, and/or representatives, and all of
    those persons in active concert or participation with them, from:

    a.  using the LEAD INFUSION Mark, or any confusingly similar term, mark
        or name, as part of any domain name, whether as a domain or otherwise,
        service mark, trademark or trade name;

    b.  using any mark that consists in whole or in part of the LEAD INFUSION
        Mark, or any variation thereof, as a designation of origin, service mark,
        trademark, trade name, or domain name, in any form, or in any manner in
        connection with the operation of an Internet website;

    c.  passing off or inducing or enabling others to sell or pass off any goods,
        services, or websites that are not authorized by Lead Infusion as goods,
        services, or websites that are sponsored, endorsed by, associated or
        affiliated with Lead Infusion;

    d.  otherwise infringing the LEAD INFUSION Mark, otherwise unfairly competing with, injuring the business reputation of, or damaging the goodwill of Lead Infusion in any manner, otherwise falsely representing themselves as being connected with, sponsored by, or associated with Lead Infusion, or otherwise engaging in deceptive trademark practices or unfair competition that in any way injures Lead Infusion;

3.  Require defendant Calladine to account for and pay to Lead Infusion all profits defendant Calladine has earned and all damages Lead Infusion has suffered as a result of defendant Calladine's unlawful acts;

4.  Require defendant Calladine to pay Lead Infusion statutory damages pursuant to Section 35(d) of the Lanham Act, 15 U.S.C. § 1117(d), in the amount of $100,000.00 per Accused Domain Name;

5.  Require defendant Calladine to pay Lead Infusion the costs of this action and the reasonable attorneys' fees Lead Infusion has incurred in connection with this action, pursuant to 15 U.S.C. § 1117(a);

6.  Require defendant Calladine to pay Lead Infusion damages for its common law claims;

7.  Order defendant Calladine to return the Accused Domain Names to Plaintiff;

8.  Order the registrars of the Accused Domain Names to return the same to Plaintiff, should defendant Calladine fail to do so within 5 days of entry of such order;

9.  Enjoin defendant Calladine from using the LEAD INFUSION Mark, pursuant to the common law of Delaware;

10. Order Gelfer the sole remaining member of Lead Infusion and defendant Calladine no longer a member of Lead Infusion;

11. Order damages in an amount to be determined at trial for breach of the Duty of Loyalty for seizing corporate opportunities;

12. Order damages in an amount to be determined at trial for breach of the Duty of
Loyalty for removing website and email;

13. Enter such other and further relief to which Plaintiff may be entitled as a matter of
law or equity, or which the Court determines to be just and proper.

## JURY DEMAND

In accordance with Federal Rules of Civil Procedure 38 and 39, the Plaintiff
asserts its rights under the Seventh Amendment of the United States Constitution and
demands a trial by jury on all issues.

Dated this 24th day of February 2014.

THE WILLIAMS LAW FIRM, P.A.

By: _____
John Legaré Williams, Esq. (Del. # 4473)
Brian Charles Crawford, Esq. (Del. #4941)
1201 Orange Street, Suite 600
Wilmington, DE 19801
Tel: (302) 575-0873
Fax: (302) 575-0925
Email: John@TrustWilliams.com
        Brian@TrustWilliams.com

COUNSEL FOR PLAINTIFF
BRIAN GELFER

LEWIS & LIN, LLC
David D. Lin
Justin Mercer
45 Main Street, Suite 608
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
Email: david@iLawco.com
        justin@iLawco.com
*pro hac vice motion pending*